The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Richard Schwartz and Roslyn Feder, on Behalf of Themselves and All Others Similarly Situaged

## DEFENDANTS

TXU Corp, Erle Nye, David W. Biegler and Michael J. McNally

**(b)** County of Residence of First Listed Plaintiff  Nassau County, Texas
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Joe Kendall
Provost Umphrey LLP
3232 McKinney Ave., Suite 700
Dallas, TX 75204

Attorneys (If Known)

RECEIVED
OCT 1 5 2002
CLERK, U.S. DISTRICT COURT

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- x 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— Med Malpractice | ☐ 620 Other Food & Drug | ☐423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury — Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **LABOR** | **SOCIAL SECURITY** | x 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | | ☐863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus: | ☐ 740 Railway Labor Act | ☐865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 530 General | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | ☐870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 540 Mandamus & Other | | ☐871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 550 Civil Rights | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- x 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Securities Fraud

## VII. REQUESTED IN COMPLAINT:

X CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: x Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE _____   DOCKET NUMBER _____

DATE  10-15-02

SIGNATURE OF ATTORNEY OF RECORD  Joe Kendall

FOR OFFICE USE ONLY

RECEIPT # _____ AMOUN _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____



**ORIGINAL**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

OCT 15 2002

| | |
|---|---|
| RICHARD SCHWARTZ and ROSLYN FEDER, On Behalf of Themselves and All Others Similarly Situated, | § Civil Action No. |
| | § |
| | § **CLASS ACTION** |
| | § |
| Plaintiffs, | § 3 - 0 2 . V . . 4 3 - M |
| | § |
| vs. | § |
| | § |
| TXU CORP., ERLE NYE, DAVID W. BIEGLER and MICHAEL J. MCNALLY, | § |
| | § **DEMAND FOR JURY TRIAL** |
| Defendants. | § |

## COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

### SUMMARY OF ACTION

1.      This is a securities class action on behalf of all persons who purchased the publicly traded securities of TXU Corp. ("TXU" or the "Company") between 4/25/02 and 10/11/02 (the "Class Period"). Plaintiffs allege violations of the federal securities laws arising out of defendants' issuance of false and misleading statements about the Company's business, operating performance and prospects.

2.      TXU provides electric and natural gas services, merchant energy trading, energy marketing, telecommunications and energy-related services. Until 2002 TXU was in a highly regulated industry. As a result the Company has paid a strong dividend of $0.60 per quarter for 12 straight quarters and at least $0.50 per share for more than 11 years.

3.      During the Class Period, defendants represented that the Company could succeed in the competition created by deregulation. Defendants then represented that TXU's European operations were improving, it would succeed in a deregulated market and it was on track to report

EPS of $4.35+ and $4.60+ in 2002 and 2003, respectively. As a result of these false statements, TXU's stock traded at artificially inflated levels, as high as $56 per share.

4.     Due to this inflation, defendants were able to complete a secondary offering of 11.8 million shares of common stock, priced at $51.15 per share and 8.8 million units of FELINE PRIDES (equity linked debt securities), raising nearly a billion dollars in much needed financing. Subsequent to the offering, defendants needed to maintain a high stock price to avoid triggering additional debt and the conversion of preferred stock into common stock pursuant to a partnership agreement.

5.     On 10/4/02, TXU issued an earnings warning, indicating that due to customer attrition and ongoing problems in Europe the Company would report 2002 EPS of only $3.25.

6.     On this news, the Company's stock price declined to $27 per share, from more than $40 per share the prior week. However, the stock continued to be inflated as defendants concealed the extreme liquidity problems from which the Company was suffering. Defendants even assured the market that the Company was strong financially and that the dividend was "*sound and secure.*"

7.     Then, on 10/14/02, before the market opened, TXU stunned the market with news that it was cutting its dividend 80% to $0.125 per share and was selling all of its European assets.

8.     The Company's stock price immediately collapsed on this news to as low as $10.10 per share before closing at $12.94, a one day drop of 31%, on volume of 39 million shares.

9.     Analysts were furious at having been misled:

• Gerard Klauer Mattison wrote on 10/14/02:

> In our view, the dividend action further undermines the company's already near non-existent credibility in that as recently as October 9 management saw no reason for the dividend to be considered in jeopardy.

• Deutsche Bank wrote on 10/14/02:

> The company's announcement appears to abandon Europe, and is likely to cause a significant write-off of the company's equity investment in Europe, about $4B currently.

• CS First Boston wrote on 10/14/02:

> The TXU's dividend cut from $2.40 per share to $0.60 annually, announced this morning, is sure to add to the differentiation in the group among the *riskier companies* and those with more secure financial and

financing pictures. While TXU's issues are clearly related to its ***troubled UK and European*** operations, the draw-down of its credit facilities, high payout ratio and lesser "earnings power" as discussed below are the issues to watch with others.

10. Analysts now expect TXU to report EPS of just $3.20 and $2.45 in 2002 and 2003, respectively, more than $1.00 per share lower for 2002 and $2 per share lower in 2003.

## JURISDICTION AND VENUE

11. The claims asserted arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t, and Rule 10b-5. Jurisdiction exists pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

## THE PARTIES

12. (a) Plaintiff Richard Schwartz purchased shares of TXU stock as described in the attached certification and was damaged thereby.

(b) Plaintiff Roslyn Feder purchased shares of TXU stock as described in the attached certification and was damaged thereby.

13. Defendant TXU is headquartered in Dallas, Texas. TXU provides electric and natural gas services, merchant energy trading, energy marketing, telecommunications and energy related services. TXU's common stock is traded in an efficient market on the New York Stock Exchange. TXU may be served with process by serving its registered agent Peter B. Tinkham at 1601 Bryan Street, Dallas, Texas 75201.

14. (a) Defendant Erle Nye ("Nye") was at all relevant times Chairman of the Board and CEO of TXU. Because of his positions, Nye knew the adverse non-public information about TXU's business, as well as its finances, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings or committees thereof, and via reports and other information provided to him in connection therewith. Just weeks before delivering devastating news to investors, on 9/10/02, Nye sold 47,485 share of TXU stock for proceeds of $2.12 million. Nye may be served with

process by serving TXU through its registered agent Peter B. Tinkham at 1601 Bryan Street, Dallas, Texas 75201.

(b)     Defendant David W. Biegler ("Biegler") was Vice Chairman of the Board of TXU. Because of his position, Biegler knew the adverse, non-public information about TXU's business, as well as its finances and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management or Board of Directors' meetings and committees thereof, and via reports and other information provided to him in connection therewith. Biegler may be served with process by serving TXU through its registered agent Peter B. Tinkham at 1601 Bryan Street, Dallas, Texas 75201.

(c)     Defendant Michael J. McNally ("McNally") was Executive Vice Chairman and CFO of TXU. Because of his positions, Biegler knew the adverse, non-public information about TXU's business, as well as its finances and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management meetings and committees thereof, and via reports and other information provided to him in connection therewith. McNally may be served with process by serving TXU through its registered agent Peter B. Tinkham at 1601 Bryan Street, Dallas, Texas 75201.

(d)     The defendants identified in ¶14(a)-(c) are referred to herein as the "Individual Defendants."

**DEFENDANTS' SCIENTER**

15.     During the Class Period, each of the Individual Defendants knew of the adverse facts alleged herein and had the power to control TXU's false and misleading public statements.

16.     Each of the Individual Defendants and TXU are liable for making false and misleading statements in that they inflated the price of TXU stock by making false and misleading statements and omitting material adverse information. The defendants' wrongful course of

- 3 -

business (i) artificially inflated the price of TXU's stock during the Class Period; (ii) deceived the investing public, including plaintiffs and other Class members, into acquiring TXU's securities at artificially inflated prices; (iii) permitted TXU to complete a secondary stock offering and issue millions of dollars worth of FELINE PRIDES; and (iv) permitted TXU to benefit economically from the wrongful course of conduct.

## BACKGROUND

17.   TXU's Texas utilities distribute electricity to 2.7 million customers and 1.4 million gas customers.  TXU has a generating capacity of some 19,000 megawatts in the state, and it owns the 7,200-mile Lone Star Pipeline.  Retail competition in Texas has prompted the Company to separate its regulated and nonregulated electric operations into two units – Oncor handles regulated transmission and distribution operations, and TXU Energy is responsible for power generation and retail energy marketing operations.  TXU Energy has also taken over TXU's wholesale energy trading operations throughout the US and in Canada.

18.   Overseas, TXU Europe was one of the largest electricity suppliers in the UK, and had 5.7 million gas and electricity customers there, as well as power station interests that give it a generating capacity of 3,100 megawatts.  It adopted TXU Energi as its UK retail brand, and has sold some UK generation and distribution assets to focus on its retail supply business.  The Company also generates and markets energy throughout Europe.  TXU Australia Holding's subsidiaries provide electricity and natural gas to about 1 million customers in Victoria.

19.   The first North Texas electric power company was founded in Dallas in 1883.  Another was built in 1885 in Fort Worth.  From these and other small power plants, three companies grew to serve most of the state: Texas Power & Light (TPL, incorporated in 1912), Dallas Power & Light (DP&L, 1917), and Texas Electric Service (TES, 1929).  Texas Utilities Company, called TU, was formed in 1945 as a holding company for the three utilities.

20.   In 1993 TU bought Southwestern Electric Service (now TXU SESCO), another Texas electric utility.  Accounting changes resulted in a loss for TU in 1995.  However, it gained entry to the telecom arena, buying a 20% stake in the Texas operations of wireless PCS Provider PrimeCo.  (The Company sold the PrimeCo stake in 1999.)  TU expanded its telecom holdings

in 1997 when it acquired phone company Lufkin-Conroe (now part of TXU Communications). In 1996, TXU bought Australian electric company Eastern Energy (now part of TXU Electricity). TU bought British utility The Energy Group (now TXU Europe) for about $10 billion in 1998. In 1999 the Company bought Australian state-owned natural gas distributors Westar and Kinetic Energy. TU also joined a consortium to build undersea power lines connecting Tasmania to the Australian mainland.

21.    Back in Texas the 1999 Legislature approved retail competition for the electric industry, beginning in 2002. That year TU restructured its operations and began using the name TXU Corp. It officially changed its name in 2000. This change would bring competition which would impact TXU's ability to successfully grow its business.

22.    In 2000, TXU acquired Norweb Energi, United Utilities' electricity and gas supply business, which added some 1.8 million electricity customers and 400,000 gas customers in the UK. TXU also contributed the stock of its telecommunications companies to Pinnacle One Partners in exchange for a 50% stake and about $960 million, which was earmarked for TXU's debt. It was with this entity that TXU entered an agreement that required TXU to maintain its stock price to avoid triggering additional debt. Efforts to reduce debt and streamline operations included TXU's sale of its natural gas processing operations, UK gas metering business and interests in a Czech utility and North Sea gas fields.

23.    In 2002, retail electric competition began in Texas, and TXU responded by separating TXU Electric's regulated and nonregulated operations. TXU Electric's name was changed to TXU US Holdings, which also took over TXU SESCO's electric operations. This increased competition. Defendants wanted to reduce debt as they new margins would be reduced in the future due to increased competition. However, competition was already adversely impacting the Company's results and if this information reached the market, TXU would be unable to raise the necessary funds to continue growing. Another issue pressing TXU to maintain a high stock price was a "trigger" related to $810 million in debt. TXU had entered a partnership agreement that could force it to convert preferred stock to common shares in the case of a default on $810 million in notes. The TXU trigger related to a partnership called Pinnacle One Partners LP in

- 5 -

which TXU held a 50% interest. Pinnacle's principal investment is in TXU Communications Ventures Co., which operates in regulated and competitive telecommunications markets and in the fiber-optic business. If Pinnacle was unable to repay $810 million in notes due August 2004, TXU would have to convert a class of preferred shares into common shares, according to filings with the SEC. The preferred shares could also be converted if TXU's share price fell below a certain level and the Company's credit rating was cut below "BB" by S&P or Fitch Ratings. The agreement also included a trigger related to TXU's credit rating from Moody's Investors Service. Thus, defendants made the false statements alleged herein to maintain the Company's stock price.

## FALSE AND MISLEADING STATEMENTS MADE BY DEFENDANTS DURING THE CLASS PERIOD

24. On 4/25/02, TXU reported its 1stQ 02 results in a release which stated in part:

TXU, a global energy services company with business interests on three continents, today announced that earnings for the first quarter ended March 31, 2002 were $0.94 per share of common stock versus $0.76 per share for the first quarter of 2001, an increase of 24%. Before an extraordinary item discussed below, earnings for the first quarter of 2002 were $1.01 per share, an increase of 22 percent over first quarter 2001 earnings of $0.83 per share, excluding unusual items.

\* \* \*

Mike McNally, chief financial officer said, "I am pleased by the continued efforts and ability of the management and employees of TXU to deliver outstanding results while continuing to focus on long term growth and shareholder value. The diversity of our operations allowed us to overcome very difficult market conditions in the UK this quarter with increased contributions from the rest of the international and North America operations, meeting our guidance for the first quarter earnings. We also continue to improve the balance sheet and are on course to achieve our goal of 55 percent long-term debt to capital this year and continued improvement thereafter. Finally, I am still very comfortable with analysts' estimates for 2002 in the general range of $4.35 to $4.45 per share and anticipate second quarter results in the $0.70 to $0.75 range."

With regard to the Company's U.K. operations, the press release provided in pertinent part as follows:

Segment results were driven primarily by difficult market conditions in the UK, where very mild winter weather contributed to low volatility and prices in electricity and gas markets. These conditions decreased the value of the length of the UK portfolio in the quarter, which tends to be a net seller to the market in the winter. Results for the rest of the year should benefit in the current price environment as the UK portfolio is a net buyer in those periods. The decreased results from UK operations were somewhat offset by added contributions from Australia and Continental Europe. Improved results from Australia were primarily driven by improved margin and favorable energy market movements.

25.     Subsequent to issuing its results, TXU hosted a conference call in which TXU management (Nye/McNally) made statements and answered questions about TXU's business and results. Defendants stated:

• Management planned to continue expansion of its generating portfolio outside of Texas and the Company was looking to expand in the UK.

• Since year-end TXU had strengthened its balance sheet by closing on the previously announced sale of the networks business in the UK. And closing on the sale of two plants in Texas was expected soon.

• The first quarter had been difficult for the UK energy business, as TXU had structured its portfolio to be long during the peak months. The winter turned out to be very mild and, accordingly, there were low wholesale prices. However, management expected to benefit from lower wholesale prices in the upcoming off-peak months where the Company's position will be short to the market. The results for the quarter and the 12-months ended were very strong. The Company was continuing to execute its strategy of adjusting the portfolio of businesses to maximize shareholder value. TXU operations were performing well.

• Customers' ability to switch providers was not hurting the Company. TXU's position was very favorable compared to budget in both customer count and load compared to where it expected to be.

• Competition was not a huge downside as competitors would probably be raising their prices.

• TXU management believed TXU could grow its International Energy business 9% to 11% by pursuing generation and retail opportunities in German and Nordic markets.

• The Company had $600 million to $800 million available per year to make acquisitions and grow its business.

• TXU was on track to report EPS of $4.35-$4.45 in 2002 and $4.60+ in 2003.

26.     Based on these statements, analysts issued reports on TXU which rated the Company as follows and forecast the following earnings for TXU:

| Firm | Analyst | Rating | 2002 EPS Forecast | 2003 EPS Forecast |
|------|---------|--------|-------------------|-------------------|
| Deutsche Bank | Dobson | Market Perform | $4.40 | |
| Vestigo/Fidelity | Sackler | Hold | $4.40 | $4.80 |
| Legg Mason | Tanner | Buy 3 | $4.35 | $4.70 |
| Credit Lyonnais | Nangia | Hold | $4.40 | $4.60 |

27.     These analysts also stated the following about TXU:

- Deutsche Bank: "Management reaffirmed 2002 earnings guidance of $4.35 to $4.45 per share and offered second quarter guidance of $0.70 to $0.75 per share. Weaker than expected UK results are expected to be offset by improved North American results.

... TXU will continue to pursue growth through acquisitions. Target markets include the US Mid Atlantic and Northeast regions, Germany, the Nordic region and the UK. The Company will target generation assets in the US and Nordic markets and retail supply assets in Germany and the UK."

- Vestigo: "Management continues to forecast annual earnings growth of 9%-11% for the Company. They believe EPS for 2003 will be in the range of $4.80 to $4.90. We are establishing our 2003 EPS estimate at $4.80. Management anticipates earnings contribution of $715-$725 million for NA Energy, $520-$530 million for the international operations and $300 million of the NA Delivery."

- Legg Mason: "We are raising our target price of TXU Corporation to $57 per share from $50. We are increasingly optimistic about the company's growth prospects and are giving it a multiple which is closer to that of the industry."

28. On 4/30/02, defendant Nye was interviewed by *Bloomberg News* concerning the Company's first quarter earnings and TKU Europe, its UK subsidiary. With regard to problems at TXU Europe, the interview went as follows:

Bloomberg: Let me ask you about the earnings picture that you describe. You saw strength? *You said that you met your first-quarter earnings, strengthened the Australian business, but [had] difficult conditions with the U.K., with the Amerada Hess unit. Is that a continuing problem, or is that quickly resolved?*

Nye: *No, no no. This is strictly related to the very mild weather that we had in the U.K. this last winter.* That's the peak period. We were a little long for the peak. We're short off peak and the wholesale market has declined, so we have to make up some of that in the coming quarters. But *that was very much of a weather-related and wholesale price related circumstance.*

                  \*   \*   \*

*We think we'll make the consensus for the remainder of the year, and that provides us a very strong earnings growth picture over the last several years, and we think that will continue for several years to come.*

29. On 5/30/02, TXU filed a Prospectus Supplement with the SEC pursuant to the issuance of 11 million shares of TXU common stock, priced at $51.15 per share. The underwriters of the offering were granted an over-allotment of 1.65 million shares. Separately, TXU filed a Prospectus Supplement to sell 8.8 million FELINE PRIDES (equity linked debt instruments). TXU ultimately issued 11.8 million shares of common stock for net proceeds of

$585 million and raised $440 million from the issuance of the PRIDES. The Prospectus represented the following with respect to TXU's European operations:

> TXU Europe's operations in the United Kingdom (UK) and other parts of Europe are primarily conducted through subsidiaries of TXU Europe Group Plc. TXU Europe serves approximately 5.7 million electricity and gas customers in the UK and is one of the largest suppliers (retailers) in England and Wales. Subsidiaries of TXU Europe also include TXU Europe Power Limited, a large generator of electricity in the UK; TXU UK Limited, one of the largest retail suppliers of natural gas in the UK; and TXU Europe Energy Trading Limited and other subsidiaries engaged in wholesale energy marketing and trading and risk management in the UK and in the central and Nordic regions of Europe.

The Prospectus also incorporated by reference TXU's 2001 Form 10-K, which included TXU's financial statements for 2001, including a balance sheet representing TXU had goodwill of $7.2 billion. The Form 10-K also included TXU's European results for 1999, 2000 and 2001 and showed growth in all areas, including:

CUSTOMERS (end of year - in thousands)

| | | | |
|---|---|---|---|
| Electric | 4,395 | 4,358 | 2,931 |
| Gas | 1,273 | 1,127 | 805 |

30.     In fact, by this time, TXU's European operations were extremely troubled and competition was already severely hindering TXU's European customer base. As a result, TXU's goodwill was overstated and its future results were sure to be much worse than represented in the filings.

31.     The Prospectus also included a section on TXU's dividends, showing that the quarterly dividend had been $0.60 per quarter for at least ten straight quarters. While the section included a sentence indicating "[f]uture dividends will depend upon TXU Corp.'s profit level and capital requirements as well as financial and other conditions existing at the time," the Prospectus omitted the fact that TXU was already in such perilous financial condition that its future dividends would undoubtedly be much lower than the amounts indicated for prior quarters.

32.     On 7/25/02, TXU reported its 2ndQ 02 results in a release which stated in part:

> TXU, a global energy services company with business interests on three continents, today announced that earnings for the second quarter ended June 30, 2002 were $0.73 per share of common stock versus $0.78 per share for the second quarter of 2001. Year-to-date earnings were $1.67 per share of common stock compared to $1.55 per share for year-to-date 2001, an increase of eight percent. Before an extraordinary item related to debt extinguishment in the first quarter, earnings for

- 9 -

year-to-date 2002 were $1.73 per share, an increase of seven percent over the prior year period earnings of $1.61 per share, excluding unusual restructuring costs in the first quarter of 2001.

Selected Quarter Highlights

* TXU took further actions to strengthen the balance sheet, maintain ample liquidity, and position the company for future growth. TXU issued over $1 billion of common stock equity and equity-linked securities (11.8 million shares of common stock and 8.8 million share of FELINE PRIDESSM). TXU also established a joint $1 billion 364-day revolving credit facility at US Holdings, Oncor and TXU Energy and a $500 million 3-year credit facility at TXU Corp. to replace the existing TXU Corp. and TXU US Holdings $1.4 billion credit facility. Oncor, TXU's electricity delivery business, issued $1.2 billion aggregate principal amount of Senior Unsecured Notes at favorable rates.

* The Public Utility Commission of Texas approved the sweeping settlement plan for TXU and two of its wholly owned subsidiaries, TXU Energy and Oncor, resolving all major pending issues related to the company's transition to competition.

* TXU strengthened its position in the German energy market with the purchase of 74.9 percent of Braunschweiger Versorgungs AG (BVAG), a wholly owned subsidiary of Stadtwerke Braunschweig. The acquisition adds 210,000 electricity, gas, heating and water customers with the network and energy businesses in the Branschweig area of central Germany, increasing TXU's German customer base to more than 650,000 and its European retail base to over 6 million residential and business customers.

* TXU completed the sale of 2,334 megawatts of gas fired electric generating plants in Texas.

* TXU completed the acquisition of 122 megawatts of gas fired generation plant in Pedricktown, New Jersey.

* TXU further strengthened its position in the Nordic region with the purchase of Forbrukerdraft, one of Norway's fastest growing retail energy suppliers with 43,000 customers. The acquisition complements TXU's existing retail interests in Atro in Finland and its 780 MW of generation output capacity through a joint venture with Powest Oy in Finland, contracts for hydro-electric power in Norway and interests in other contracts for electricity in Finland.

* TXU will begin serving approximately 34,000 residential and small business customers of NewPower in the Houston area in an agreement that provides a new base of customers in Houston for TXU and provides the customers with a seamless transition.

* TXU launched several innovative new programs in Australia to further enhance customers' lives. One program saves pensioners money by making their energy payments "worry free" through direct debit, which helps TXU reduce billing and payment processing costs. TXU Electricians was launched to provide a reliable, fixed price, one-stop service to customers, 24 hours a day, seven days a week. A dual fuel product was introduced

that combines gas and electricity into a single monthly bill – the first of its kind in Australia.

* TXU Energy in North America launched TXU Energy Sentinel, providing large commercial and industrial customers the freedom to choose from a comprehensive suite of 26 energy management services.

* TXU further evidenced its commitment to the environment with several events in the second quarter. TXU won the annual Kenes C. Bowling National Mine Reclamation Award from the Interstate Mining Compact Commission for reclamation in the coal category at its Monticello Mine in east Texas. TXU also partnered with the Dallas Trees and Parks Foundation and Richland College to create the largest known non-profit urban tree farm in the United States. In addition, a TXU joint venture made applications for the largest offshore wind farm in the UK, an approximate 200 MW development in northwest England in the Solway Firth.

Regarding the financial results, Mike McNally, chief financial officer said, "This is yet another example of the focus and ability of the TXU team to deliver excellent results in challenging times. As in the first quarter, the diversity of our operations allowed us to overcome continued difficult market conditions in the UK with increased contributions from the rest of the international and North America operations. We also continue to position for growth and improve the balance sheet and have exceeded our near term goal of 55 percent long-term debt to capital this year."

McNally continued, "We expect third quarter earnings to be in a range of $1.55 to $1.60 per share and fourth quarter earnings of $1.05 to $1.10 per share of common stock. While the continued challenges in the UK market will place some pressure on the achievement of our 2002 target of $4.35 to $4.45, with normal summer weather in Texas, continued progress on initiatives in place in the UK to enhance margins through restructuring long term contracts and physical generation positions, and anticipated cost reductions and other initiatives globally, we remain focused on achieving this guidance. These initiatives will also position us well to meet 2003 expectations in the $4.80 to $4.90 per share range."

33. Subsequent to issuing its results, TXU hosted a conference call in which TXU management (Nye/McNally) made statements and answered questions about TXU's business and results. Defendants stated:

• TXU was working to restructure UK power contracts to improve results for its European operations.

• TXU was on track to report EPS of $4.35-$4.45 in 2002 and $4.80+ in 2003.

34. On the call, Nye stated in pertinent part as follows:

There should be no doubt that we have sound accounting practices and do not trade to artificially increase revenues. However, our stock price has fallen significantly as bad news runs rampant through the sector.

35.    Following this report, Paul Fremont, an analyst at Jefferies & Co. commented positively on the Company's outlook and stated in pertinent part as follows:

> People had been expecting a blow up in Europe. ***The fact they reaffirmed guidance, even with the possibility of missing, is better than anticipated.***

Based on these statements, other analysts issued reports on TXU which rated the Company as follows and forecast the following earnings for TXU:

| Firm | Analyst | Rating | 2002 EPS Forecast | 2003 EPS Forecast |
|------|---------|--------|-------------------|-------------------|
| Deutsche Bank | Dobson | Market Perform | $4.35 | $4.70 |
| Credit Lyonnais | Nangia | Add | $4.40 | $4.60 |

36.    On 9/17/02, TXU was forced to delay the sale of $439 million in bonds in Australia as demand had weakened.

37.    In fact, defendants' statements between 4/25/02 and 7/25/02 were materially false and misleading due to the following undisclosed facts:

(a)    The new regulatory environment was already having such a severe impact on TXU's business that it was only a matter of time before TXU would have to dispose of certain business units and seek additional financing;

(b)    TXU's European operations were faring much worse than represented and were not recovering after a slow winter and competition in Europe was making the operations not profitable and not worth TXU's continued investment, such that a disposition would be necessary;

(c)    The Company claimed to be successfully addressing the previous problems in its U.K. operations and represented that these problems were being "quickly resolved," when, in fact, the reduced wholesale electricity prices in the UK power markets was a "continuing problem" which would persist in eroding the Company's profit margins;

(d)    The Company lacked adequate internal controls and had deficiencies in its planning and budgeting systems, and was therefore unable to ascertain the true extent of the problems at its UK operations;

(e)     TXU's financial condition was precarious and the Company would be in danger of investment downgrades in the near future;

(f)     TXU's dividend rate was too high considering its financial condition and would have to be curtailed to save money.  Such a reduction would trigger a terrible chain of events.  It would most certainly cause a drop in the Company's stock price since many of TXU's shareholders relied on the dividend.  A reduction in the stock price would trigger consolidation of Pinnacle One Partners partnership into TXU's financial statements, increasing its debt and would force the conversion of preferred stock into common stock;

(g)     Customer attrition was a growing problem as customers left TXU for more economical alternatives; and

(h)     TXU was not on track to achieve EPS of $4.35+ and $4.60+ in 2002 and 2003, respectively.

38.     On 10/4/02, TXU issued a release revising earnings expectations for 2002 and 2003.  The release stated in part:

> TXU, a global energy services company serving customers in the United States, Europe and Australia, announced today that it is adjusting its guidance for earnings for the third quarter ended September 30, 2002 to a range of US$0.90 to US$0.95 and fourth quarter to a range of US$0.60 to US$0.65 per share of common stock. Management is also adjusting its guidance for the year 2002 to a range of US$3.20 to US$3.25 per share of common stock, and its guidance for the year 2003 to a range of US$3.45 to US$3.55 per share of common stock.
>
> *     *     *
>
> [Erle Nye, chairman and chief executive, said] "While I am very disappointed with these results, I am convinced that we have a superior strategy and business model that will deliver long-term value.  TXU's management team remains focused on enhancing shareholder value, continually improving the balance sheet, and maintaining a sound and attractive dividend."

39.     In an interview following this announcement, defendant Nye acknowledged that the Company had failed to adequately supervise its deteriorating situation in the U.K.  When questioned regarding this latest revelation, defendant Nye stated in pertinent part as follows:

> *We understood the individual implications of these various things but when they acted in concert we didn't fully comprehend what we had a hold of there.  And this is a very troublesome thing.*
>
> *     *     *

> *We were clearly the victims of undue optimism. As we've looked into what happened there, it seems to me that the planning process, which includes the budgeting process, was deficient.*

Defendant Nye further stated:

> *We have also determined that we've got some deficiencies in our planning and budgeting systems there so the data didn't give us the early warning that we should have had.*

40.     The Company's stock dropped to $27 on this shocking news but continued to trade at artificially inflated levels as the Company assured investors its dividend was safe and stated that its business was sound. In fact, on 10/9/02, Nye stated on a conference call with investors that:

> TXU is strong financially and entirely capable of maintaining normal operations as a highly regarded enterprise. *The dividend is sound and secure, and [with] those earning growths of about eight percent for '03 over '02, combined with exceptional cash flows, the prospects for the Company and its investors are very attractive.*

Defendant McNally was also questioned regarding these latest developments. With regard to the Company's ongoing support for TXU Europe, he responded in pertinent part as follows:

> *I don't see any circumstances under which we'd walk away from Europe.*

41.     On 10/8/02, the Company issued a press release reaffirming its strong financial position and liquidity which, among other things, "will provide ample funding for the strong dividend." The Company also reported that a credit rating downgrade of a European unit may trigger the early repayment of at least 275 million pounds ($430 million) in bonds. TXU promised holders of a bond maturing in 2030 that it would repay the money raised in the bond offering if any ratings company reduced its creditworthiness to below investment grade and it was prejudicial to their interest. Analysts said that this appeared to be the case after Fitch Ratings cut the Company's senior unsecured rating to BB from BBB- on 10/4/02.

42.     As a result, TXU's stock stabilized in the $15-$18 range.

43.     On October 10, 2002, an article in the *Fort Worth Star Telegram* reiterated defendants' commitment to maintaining the Company's dividend payment and stated in pertinent part as follows:

> Executives reiterated that TXU has $2.6 billion in cash on hand for contingencies and suggested that banks would drop the so-called cross-collateralization of

- 14 -

European debt. *They also said the Dallas-based utility has no plans to reduce its quarterly dividend of 60 cents per share.*

44.     On October 11, 2002, an article in *The New York Times* reported on the confusion regarding the cross-default clause, stating in pertinent part as follows:

> At that conference call, and the ones that followed on Monday and Wednesday, officials seemed to have trouble sorting out the facts, particularly about the company's debt situation. "We made mistakes," Mr. Nye conceded. There was plenty of confusion over whether a default on British debt would lead to a cross-default on American debt. It would, but for only $500 million. "I asked our treasury people how that got in there," Mr. Nye said of the cross-default clause. "Nobody has been able to give me a reason."

With regard to the Company's continued payment of its dividend, the article quoted defendant Nye, who positively stated in pertinent part as follows:

> *I believe the dividend is secure. I don't know of anything today that would make me think otherwise.*

45.     Then on 10/14/02, TXU issued a release announcing it would cut its dividend 80% and would exit from Europe, offering its European assets up for sale! The release stated:

> TXU announced that it took dramatic action today to ensure that TXU Corp.'s credit and liquidity position remains strong.
>
> In order to meet the new requirements of the rating agencies for investment grade credit, TXU's Board of Directors declared a quarterly dividend of $0.125 per share of common stock. This represents an 80 percent reduction from the previous quarterly dividend of $0.60 per share. The dividend will be paid on January 2, 2003 to shareholders of record on December 6, 2002. The indicated annual dividend is now $0.50 per share of common stock.
>
> Erle Nye, Chairman and Chief Executive, said, "Today's actions are the direct result of rating agencies' concerns as to the company's liquidity and credit situation. Today's financial markets and concerns of the rating agencies have forced us to take this dramatic action."

46.     On this news, TXU's stock collapsed to as low as $10.10 per share, before closing at $12.94 per share on volume of 39 million shares.

47.     Analysts were furious at having been misled:

• Gerard Klauer Mattison wrote on 10/14/02:

> In our view, the dividend action further undermines the company's already near non-existent credibility in that as recently as October 9 management saw no reason for the dividend to be considered in jeopardy.

• Deutsche Bank wrote on 10/14/02:

- 15 -

The company's announcement appears to abandon Europe, and is likely to cause a significant write-off of the company's equity investment in Europe, about $4B currently.

- CS First Boston wrote on 10/14/02:

    The TXU's dividend cut from $2.40 per share to $0.60 annually, announced this morning, is sure to add to the differentiation in the group among the riskier companies and those with more secure financial and financing pictures. While TXU's issues are clearly related to its *troubled UK and European* operations, the draw-down of its credit facilities, high payout ratio and lesser "earnings power" as discussed below are the issues to watch with others.

- W.H. Reaves & Co. wrote on 10/14/02:

    The Company a few weeks ago was saying the dividend was secure. This doesn't help its credibility.

48.     Analysts now expect TXU to report EPS of just $3.20 and $3.45 in 2002 and 2003, respectively, more than $1.00-$2.00 a share lower for each year.

## CLASS ACTION ALLEGATIONS

49.     Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23, on behalf of all persons who purchased or otherwise obligated themselves to purchase the publicly traded securities of TXU between 4/25/02 and 10/11/02 (the "Class Period").

50.     The Class is composed of persons dispersed throughout the United States, the joinder of whom in one action is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of 8/02, TXU had more than 278 million shares of stock outstanding, owned by hundreds, if not thousands, of shareholders.

51.     There is a well-defined community of interest in the questions of law and fact involved in this case. The questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include the following:

(a)     Whether §§10(b) and 20(a) of the Exchange Act were violated by TXU and the Individual Defendants.

(b)     Whether defendants misrepresented material facts;

(c)     Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- 16 -

(d)     Whether the defendants knew or should have known that their statements were false and misleading;

(e)     Whether the prices of TXU securities were artificially inflated during the Class Period; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

52.     Plaintiffs' claims are typical of those of the Class because plaintiffs and the Class sustained damages from defendants' wrongful conduct.

53.     Plaintiffs will adequately protect the interests of the Class.  Plaintiffs have retained counsel who are experienced in class action securities litigation.  Plaintiffs have no interests which conflict with those of the Class.

54.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

55.     The prosecution of separate actions by individual Class members would create a risk of inconsistent and varying adjudications.

### FIRST CAUSE OF ACTION

**For Violation of §10(b) of the Exchange Act and
Rule 10b-5 Against TXU and the Individual Defendants**

56.     Plaintiffs incorporate ¶¶1-55 by reference.

57.     Each of the defendants: knew the material, adverse, non-public information about TXU's financial results and then-existing business conditions, which was not disclosed; and participated in drafting, reviewing, and/or approving the misleading statements, releases, reports, and other public representations of and about TXU.

58.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

59.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

- 17 -

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of TXU securities during the Class Period.

60.     Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for TXU securities. Plaintiffs and the Class would not have purchased TXU securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## SECOND CAUSE OF ACTION

### For Violation of §20(a) of the Exchange Act
### Against TXU and the Individual Defendants

61.     Plaintiffs incorporate ¶¶1-60 by reference.

62.     The Individual Defendants acted as controlling persons of TXU within the meaning of §20(a) of the Exchange Act. By reason of their positions as directors and/or officers of TXU they had the power and authority to cause TXU to engage in the wrongful conduct complained of herein. TXU controlled each of the Individual Defendants and all of its employees.

63.     By reason of such wrongful conduct, the Individual Defendants and TXU are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their purchases of TXU common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

- 18 -

B.    Awarding plaintiffs and members of the Class compensatory damages;

C.    Awarding plaintiffs and members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs;

D.    Awarding extraordinary, equitable or injunctive relief as permitted by law or equity; and

E.    Awarding such other relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

PROVOST UMPHREY LAW FIRM, LLP

*Joe Kendall*

JOE KENDALL
State Bar No. 11260700
3232 McKinney Avenue, Suite 700
Dallas, TX 75204
Telephone: 214/744-3000
214/744-3015 (fax)

**Attorneys in Charge**

**Of Counsel:**

MILBERG WEISS BERSHAD
  HYNES & LERACH LLP
WILLIAM S. LERACH
DARREN J. ROBBINS
401 B Street, Suite 1700
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

FRUCHTER & TWERSKY
JACK G. FRUCHTER
One Pennsylvania Plaza, Suite 1910
New York, NY 10119
Telephone: 212/279-5050
212/279-3655 (fax)

LAW OFFICES OF LAWRENCE G.
  SOICHER
LAWRENCE G. SOICHER
305 Madison Avenue, 46th Floor
New York, NY 10165
Telephone: 212/883-8000
212/697-0877 (fax)

## CERTIFICATION OF
## RICHARD SCHWARTZ
## IN SUPPORT OF CLASS ACTION COMPLAINT

Richard Schwartz ("plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed a draft of the Complaint prepared by counsel in the above-captioned case, and authorizes its filing.

2.      Plaintiff did not purchase the securities that are the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.      During the proposed Class Period, plaintiff executed transactions in the securities of TXU Corporation (NYSE: TXU) as follows:  See Attached Schedule.

5.      In the past three years, plaintiff has not sought to serve as a representative party on behalf of a class in an action filed under the federal securities law except:

6.     Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 11 day of October, 2002.

_Marvin Cepler_ Executor

Richard Schwartz

**Schedule A**

**Richard Schwartz Transaction(s) in**
**TXU Corporation Securities**

Purchase(s):

| Date | Shares | Price |
|------|--------|-------|
| 07/10/02 | 1000 | 543.75 |

## CERTIFICATION OF ROSLYN FEDER
## IN SUPPORT OF CLASS ACTION COMPLAINT

Roslyn Feder ("plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the complaint prepared by counsel in the above-captioned case and has authorized its filing.

2.    Plaintiff did not purchase the security that is the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.    During the proposed Class Period, plaintiff executed the following transactions in the stock of TXU Corporation: See Attachment A

5.    In the past three years, plaintiff has not sought to serve, nor has served as a representative party on behalf of a class in an action filed under the federal securities laws.

6.    Plaintiff will not accept payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this /5th

day of _October_ , 2002.

ROSLYN FEDER

ATTACHMENT A

| Date | Action | Amount | Price |
|---|---|---|---|
| October 7, 2002 | Buy | 100 shares | $22.45 |